BARRY WASHINGTON
barrywashington.bw@gmail.com
PO Box 1572
Portland, OR 97207
971.266.1857

Plaintiff, Self-Represented Party

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| BARRY WASHINGTON,<br><br>               Plaintiff,<br>   v.<br><br>CITY OF BEAVERTON, a municipal corporation organized under Oregon law;<br>OFFICER JASON FARLOW, Beaverton Police Department, sued in his individual and official capacities;<br>OFFICER COCHRANE, Beaverton Police Department, sued in her individual and official capacities;<br>MULTNOMAH COUNTY, a political subdivision of the State of Oregon;<br>SHALAE MOORE, Multnomah County Department of Community Justice, sued in her individual and official capacities; and<br>JIM STEVENS, Multnomah County Department of Community Justice, sued in his individual and official capacities,<br>               Defendants. | Case No.: 3:26-cv-00908-YY<br><br>**FIRST AMENDED COMPLAINT Civil Rights Action Under 42 U.S.C. § 1983**<br>*First Amendment Retaliation; Fourth Amendment Unreasonable Seizure; Fourteenth Amendment Procedural Due Process; Fourteenth Amendment Equal Protection; Municipal Liability; Declaratory and Equitable Relief*<br><br><br><br>**DEMAND FOR JURY TRIAL** |

## I. INTRODUCTION

1.      This is a civil-rights action under 42 U.S.C. § 1983. Plaintiff BARRY

WASHINGTON seeks relief for the use of supervision authority, administrative arrest authority,

and police arrest authority after he challenged the legal basis for supervision demands later used against him.

2.     Plaintiff does not challenge every supervision condition, every act of supervision, or the existence of lawful supervision authority in this action. Plaintiff challenges the use of unsupported, unverified, or unauthorized supervision demands as violation predicates, arrest predicates, custody predicates, and continuing record entries.

3.     The case turns on a manageable sequence. County officials maintained disputed supervision predicates after notice. County officials then used or approved those predicates in an administrative arrest process. Beaverton officers then escalated a parking-lot encounter near Cedar Hills Boulevard and Walker Road into a show-of-authority seizure and later arrest, while identifying the arrest to Plaintiff as a warrant for firing a weapon in public.

4.     Plaintiff seeks damages, declaratory relief, correction or segregation of continuing records, and further equitable relief necessary to prevent future reliance on the challenged records.

**Scope of Claims**

5.     Plaintiff does not seek relief that would necessarily invalidate his criminal conviction, alter the sentence imposed by the sentencing court, or require this Court to resolve issues reserved for direct appeal, habeas corpus, administrative review, or state-court judicial review.

6.     Plaintiff instead seeks relief for separate civil-rights injuries caused by retaliation, unreasonable seizure, inadequate process, municipal practices, and continuing government records that allegedly rest on unsupported predicates.

7.    Plaintiff does not concede that the supervision status, time calculations, arrest-order process, condition enforcement, or records described below were lawful. Plaintiff pleads this limitation to clarify the federal civil-rights injury and to avoid unnecessary collateral-attack issues.

## II. JURISDICTION AND VENUE

8.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because this action arises under the Constitution and 42 U.S.C. § 1983.

9.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to the extent Oregon supervision statutes, administrative rules, records, and procedures are relevant to the federal constitutional claims.

10.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events occurred in Oregon and within this District.

11.    This action was filed in Multnomah County Circuit Court and removed to this Court by Defendants.

## III. PARTIES

12.    Plaintiff BARRY WASHINGTON is a Black American man and a natural person who lived, worked, and maintained family ties in the Portland metropolitan area during the events alleged in this complaint.

13.    Defendant City of Beaverton is an Oregon municipal corporation. It operates the Beaverton Police Department and is responsible for the Department's policies, customs, practices, training, supervision, warrant-verification practices, arrest practices, and record practices.

FIRST AMENDED COMPLAINT - Page 3

14.     At all relevant times alleged herein, Defendant Officer Jason Farlow was a Beaverton police officer. He acted under color of state law. Plaintiff sues Farlow in his individual and official capacities.

15.     At all relevant times alleged herein, Defendant Officer Cochrane was a Beaverton police officer. She acted under color of state law. Plaintiff sues Cochrane in her individual and official capacities.

16.     Defendant Multnomah County is a political subdivision of the State of Oregon. It operates the Multnomah County Department of Community Justice, referred to in this complaint as DCJ.

17.     DCJ administers community supervision, including probation, post-prison supervision, local-control supervision, supervision records, sanctions, administrative arrest processes, transfer records, and records correction practices.

18.     At all relevant times alleged herein, Defendant Shalae Moore was a DCJ supervision officer. Moore supervised Plaintiff, created or relied on supervision predicates, communicated with law enforcement, and participated in the administrative arrest process. Moore acted under color of state law. Plaintiff sues Moore in her individual and official capacities.

19.     At all relevant times alleged herein, Defendant Jim Stevens was a DCJ supervisor. Stevens reviewed, approved, maintained, adopted, or failed to correct the disputed supervision predicates and administrative arrest process. Stevens acted under color of state law. Plaintiff sues Stevens in his individual and official capacities.

20.     The official-capacity allegations are municipal-liability and equitable-relief allegations. Plaintiff sues the individual defendants in their individual capacities for damages arising from their own conduct. Plaintiff identifies their official capacities to preserve claims for declaratory and equitable relief and to connect official-capacity conduct to the municipal-liability allegations against the City of Beaverton and Multnomah County.

**Legal and Administrative Framework**

21.     Oregon post-prison supervision conditions must be specified in writing by the State Board of Parole and Post-Prison Supervision or the local supervisory authority responsible. Or. Rev. Stat. § 144.102(1).

22.     The Board or supervisory authority may determine and modify post-prison supervision conditions. Or. Rev. Stat. § 144.102(2).

23.     Special conditions must be based on the individual circumstances of the person on supervision. Or. Rev. Stat. § 144.102(4)(a).

24.     Oregon administrative rules establish procedures for transferring supervision between county community-corrections agencies. Or. Admin. R. 291-019-0100.

25.     Before county supervision responsibility changes, the transfer process considers public safety and which county can provide effective supervision under the conditions set by the releasing authority. Or. Admin. R. 291-019-0120.

26.     Transfer records include sentencing information, docket information, special conditions, residence information, and noncompliance history. Or. Admin. R. 291-019-0130.

27.     Oregon courts have recognized that special post-prison supervision conditions must reasonably relate to public safety or offender reformation. See *Penn v. Bd. of Parole &*

*Post-Prison Supervision*, 365 Or. 607, 635, 451 P.3d 589 (2019); *Weems v. Bd. of Parole &*

*Post-Prison Supervision*, 347 Or. 586, 600-01, 227 P.3d 671 (2010).

28.    Oregon law permits the Department of Corrections (Department) or another

supervisory authority to order arrest and detention after being informed and having reasonable

grounds to believe a supervised person violated a condition. Or. Rev. Stat. § 144.350(1)(a).

29.    Before issuing an arrest order for an alleged violation, the Department or

supervisory authority must investigate whether the terms of release were violated. Or. Rev. Stat.

§ 144.350(1)(b).

30.    An administrative order issued under Or. Rev. Stat. § 144.350 supplies DCJ

statutory arrest authority. It is not a judicial warrant issued by a court after judicial probable

cause review.

31.    Oregon law separately limits local confinement for post-prison supervision

violations. A person may not be confined in jail for more than 15 days for a post-prison

supervision violation unless a statutory exception applies. Or. Rev. Stat. § 144.106(3).

32.    A person on parole or post-prison supervision retains a protected liberty interest in

continued freedom from custody. *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

33.    Due process requires notice, disclosure of evidence, an opportunity to be heard, a

neutral decision maker, and a written statement of reasons before revocation or a comparable

loss of conditional liberty. Morrissey, 408 U.S. at 489.

34.    Qualified immunity turns on objective reasonableness and clearly established law.

Government officials are not protected when their conduct violates clearly established rights that

a reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

35.    Qualified immunity does not protect officials who cause an arrest or seizure through objectively unreasonable reliance on unsupported or inadequately verified predicates. See *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986).

36.    Plaintiff does not seek damages against Hearing Officer Jennifer Reiser for a protected adjudicative act. Plaintiff pleads her hearing role as factual context, as evidence of notice, and as a source of records and recordings relevant to the due-process and statutory-confinement issues.

37.    The Equal Protection Clause prohibits intentionally discriminatory law-enforcement action, including selective enforcement or investigative escalation because of race.

38.    Beaverton Police Department Policy 401 prohibits bias-based policing. The policy defines bias-based policing to include inappropriate reliance on race, color, national origin, or other protected characteristics as the basis for law-enforcement service or enforcement.

39.    Beaverton's policy requires an articulable reason for contact independent of protected characteristics. Policy 401 states that officers contacting a person must be prepared to articulate sufficient reason for the contact, independent of the person's protected characteristics.

40.    Beaverton collects STOP data for officer-initiated contacts. Its public bias-based-policing report states that officers must record the reason for a traffic or pedestrian stop or other contact, the officer's perception of race, color, or national origin, whether a search occurred, and the disposition.

41.    Beaverton's bias-based-policing reports are reviewed for training and operational changes. The City's public report states that the report is reviewed by the Chief of Police to identify changes in training or operations that should be made to improve service.

FIRST AMENDED COMPLAINT - Page 7

## IV. FACTUAL ALLEGATIONS

**A. The written supervision record did not show the County authority and treatment framework later used against Plaintiff.**

42.     Plaintiff was convicted in Washington County Circuit Court Case No. 21CR25804.

43.     Washington County Circuit Court later revoked Plaintiff's probation and imposed a term of incarceration followed by post-prison supervision.

44.     Plaintiff resided in Washington County during the relevant supervision period.

45.     Multnomah County DCJ administered Plaintiff's supervision during substantial parts of the events alleged in this complaint.

46.     Plaintiff requested clarification concerning the basis of Multnomah County's supervision authority.

47.     Plaintiff also requested records concerning supervision transfer, supervision conditions, violation reports, arrest orders, sanctions, detention records, and related DCJ decisions.

48.     Records produced to Plaintiff have not shown a transfer request, acceptance, delegation, or administrative assignment explaining how Multnomah County obtained formal responsibility for Plaintiff's supervision.

49.     The unclear transfer record affected Plaintiff's ability to know which county controlled his supervision, which conditions applied, and which agency had authority to respond to alleged violations.

50. During the criminal and revocation proceedings, the sentencing court did not impose the substance-abuse treatment framework later enforced by Moore and Stevens.

51. The governing written supervision materials available to Plaintiff did not include the substance-abuse package, drug and alcohol treatment requirement, or treatment-based family-contact condition later enforced by Moore and Stevens.

52. Plaintiff understood the governing contact condition to require written supervisor permission before contact with the mother of his child.

53. The mother of Plaintiff's child had physical custody of the child.

54. As a practical matter, withholding written permission to contact the mother restricted Plaintiff's contact with his child.

55. Plaintiff had substantially completed self-referred domestic-violence treatment.

56. Plaintiff and AshLe Penn repeatedly asked DCJ to consider that progress when addressing family contact.

57. DCJ officials withheld or limited written permission for family contact until Plaintiff complied with the substance-abuse treatment framework.

58. DHS or child-welfare personnel communicated that Plaintiff's relationship with his child was important and should be maintained.

59. Moore and Stevens did not provide written authority showing that the substance-abuse framework had been imposed as a special condition before treating it as enforceable.

60. If Defendants contend such authority existed, the relevant orders, reports, communications, and supervision records remain in Defendants' possession.

**B. Plaintiff complained about Moore's supervision, and Moore soon reported alleged warrant information during a traffic stop.**

61.    On January 13, 2023, Plaintiff submitted a formal written grievance to Andrew Altman, a DCJ manager.

62.    The grievance concerned Moore's exercise of supervision authority, condition demands, and treatment of Plaintiff.

63.    Altman responded the same day.

64.    Altman directed Plaintiff to continue obeying the conditions set for community supervision and Moore's directions while the grievance remained pending.

65.    The January 13, 2023 grievance complained about government supervision conduct and requested official correction.

66.    The grievance identified Moore as the supervision officer whose conduct was challenged.

67.    On or about January 21, 2023, Plaintiff was stopped by law enforcement during a traffic stop.

68.    During that stop, Moore communicated with the officer conducting the stop.

69.    Moore directed or requested that the officer arrest Plaintiff on an alleged failure-to-appear warrant.

70.    No failure-to-appear warrant existed.

71.    Police reports document the January 21, 2023 traffic stop and Moore's involvement.

72. The stop occurred approximately eight days after Plaintiff submitted the grievance.

**C. DCJ supervisors and managers received notice before and during the arrest, custody, and record process.**

73. Plaintiff and AshLe Penn repeatedly notified DCJ supervisors and officials that Moore was enforcing supervision requirements not imposed in the governing written conditions.

74. Before the administrative-arrest process, and later during the custody and record process, those notices reached Altman, Stevens, Scroggin, Holt, Wallis, and other DCJ personnel.

75. In late April 2023, Plaintiff contacted Jay Scroggin about professional standards review and identified Moore's supervision conflict.

76. Scroggin asked for more information.

77. Plaintiff identified his minor child, identified Moore as his post-prison supervisor, and explained the family-contact and supervision conflict.

78. In May and June 2023, AshLe Penn told Altman that DCJ maintained the contact framework despite Plaintiff's compliance and despite a proposed no-offensive-contact alternative.

79. AshLe Penn also told Altman that the condition burdened family association and did not account for prior communications with a supervising officer about allowing contact.

80. Altman responded that DCJ would not seek modification at that time and required compliance with existing conditions before reconsideration.

FIRST AMENDED COMPLAINT - Page 11

81.    Altman copied Moore and Stevens on at least one communication so the supervision team would be on the same page.

82.    In August 2023, a DCJ victim advocate informed AshLe Penn that Local Control set Plaintiff's conditions.

83.    The same communication stated that the PO and supervisor were not giving written permission for contact until Plaintiff completed other supervision demands.

84.    The same communication identified Brian Holt as the Local Control Unit manager for condition grievances and Lonnie Nettles as Holt's supervisor.

85.    The same communication identified Travis Gamble as a senior manager for complaints about the PO or the PO's supervisors.

86.    By August 2023, before the January 2024 administrative arrest process and the on-or-about February 4, 2024 parking-lot arrest, DCJ personnel had received communications challenging the condition framework, family-contact restriction, and supervision administration through DCJ channels.

87.    During the period later used to support the administrative arrest process and related supervision consequences, Plaintiff remained in written communication with DCJ officials through official channels.

88.    On January 26, 2024, Plaintiff sent written notice to Stevens, Scroggin, and Holt concerning the administration of his supervision. Stevens responded on January 29, 2024 while copying Scroggin, Holt, and Moore, and advised that an outstanding warrant existed for alleged supervision violations.

89.    After receiving that response, Plaintiff continued communicating with Moore and Stevens through DCJ channels concerning the asserted warrant, supervision demands, and alleged violation predicates.

90.    After the parking-lot arrest, in February 2024, AshLe Penn emailed Stevens, Wallis, and Scroggin concerning records, victim rights, and access to information that would be used in a contested hearing process.

91.    Tami Wallis later identified requested records concerning Moore's asserted authority to mandate drug testing and substance-abuse treatment, violation reports, arrest orders, Senate Bill 1510 compliance, measurable contacts, and detention records.

92.    After the pre-arrest notices, the challenged condition framework remained in effect.

93.    After the January and February 2024 notices, the custody, hearing, and record process proceeded without correction of the disputed predicates.

**D. Moore initiated, and Stevens approved or maintained, an administrative arrest process based on disputed predicates.**

94.    In January 2024, Moore initiated, requested, or maintained an administrative arrest process based on alleged supervision violations.

95.    Plaintiff has not received the January 2024 administrative arrest document, warrant request, arrest order, or equivalent supervision record that later caused the on-or-about February 4, 2024 Beaverton arrest.

96.    Based on records available to Plaintiff, that January 2024 administrative process later supplied the authority used for the on-or-about February 4, 2024 Beaverton arrest.

FIRST AMENDED COMPLAINT - Page 13

97.     The January 2024 administrative arrest document, warrant request, arrest order, or equivalent supervision record remains in Defendants' possession or control, or in records available to Defendants.

98.     The alleged violation predicates included noncompliance with supervision directions and treatment-related demands that Plaintiff had already challenged as unauthorized, unsupported, or not reflected in the governing written supervision conditions.

99.     County records characterized Plaintiff as discharged from Cascadia or as failing to engage in treatment, and Defendants later treated that characterization as a violation predicate without first identifying a written supervision condition or adequate review process authorizing that use.

100.    Before the arrest process was used against him, Plaintiff asked Moore and Stevens to identify the lawful basis for treating the disputed treatment framework as an enforceable supervision condition.

101.    Moore did not identify a written order imposing the disputed treatment framework before using or maintaining it as a basis for arrest, detention, or later supervision consequences.

102.    Stevens reviewed, approved, maintained, or adopted Moore's arrest process after receiving notice of Plaintiff's objections and before the process was transmitted to law enforcement.

103.    Stevens's notice included pre-arrest communications copied to him in 2023 concerning the treatment framework, family-contact restrictions, and disputed supervision demands.

FIRST AMENDED COMPLAINT - Page 14

104.    No court issued a judicial arrest warrant for Plaintiff based on firing a weapon in public.

105.    No court reviewed the administrative arrest order before Beaverton officers executed it.

106.    Plaintiff did not receive a meaningful opportunity to challenge the alleged violation predicates before the administrative arrest process was used against him.

**E. Farlow positioned his vehicle during a parking-lot encounter and later identified the arrest as a weapons warrant.**

107.    In the early morning hours of February 4, 2024, Plaintiff sat in a parked vehicle at the Walker Center on Cedar Hills Boulevard in Beaverton. The vehicle was backed into the parking space, leaving Plaintiff visible and readily identifiable.

108.    The vehicle was turned off.

109.    Plaintiff was sitting in the vehicle and scrolling through his phone.

110.    Farlow had not observed Plaintiff commit a traffic offense.

111.    Farlow had not observed Plaintiff threaten anyone, possess or fire a weapon, or engage in conduct suggesting an immediate public safety risk.

112.    Plaintiff is a Black man.

113.    Farlow's report identified Plaintiff by race and appearance, including that Plaintiff was a Black male with a large black beard.

114.    Before any physical restraint or transport, Farlow positioned his police vehicle in front of Plaintiff's vehicle without activating emergency lights.

FIRST AMENDED COMPLAINT - Page 15

115. The positioning blocked or restricted Plaintiff's forward movement.

116. After momentarily blocking or restricting Plaintiff's forward movement, Farlow repositioned his police vehicle across the parking lot while maintaining sight of Plaintiff's vehicle.

117. Plaintiff remained in the parking lot and did not drive away after Farlow's vehicle positioning and continued observation.

118. Farlow used vehicle-registration, DMV, or associated-person information to investigate Plaintiff or persons associated with the vehicle.

119. The registered-owner information available to Farlow did not identify Plaintiff as the registered owner.

120. The registered-owner information available to Farlow identified a person who did not match Plaintiff's sex or appearance.

121. Farlow continued the investigation after observing Plaintiff and after reviewing registration or associated-person information that did not identify Plaintiff as a suspect in any crime.

122. Ordinary DMV registration information did not identify Plaintiff as the registered owner, co-owner, or authorized registrant of the vehicle.

123. Farlow appeared to identify Plaintiff by name before asking who Plaintiff was, what Plaintiff was doing, or whether Plaintiff was connected to the vehicle.

124. Farlow approached Plaintiff with an arrest posture, called Plaintiff by name, and stated that Plaintiff was under arrest.

125. Farlow identified the arrest basis as a warrant for firing a weapon in public, or words to that effect.

126. In 2021, Plaintiff and the vehicle's registered owner were associated in a criminal investigation involving a firearm-related charge.

127. The firearm-related charge against Plaintiff from that 2021 matter was dismissed before the February 4, 2024 parking-lot encounter.

128. No court adjudicated that Plaintiff fired a weapon in public, and Plaintiff disputes any characterization that he was guilty of that conduct.

129. Plaintiff alleges the prior dismissed firearm-related case for limited context. The dismissal explains why Farlow's later statement that Plaintiff was being arrested on a warrant for firing a weapon in public was material and stigmatizing.

130. The dismissed case also provides context for Plaintiff's allegation, made on information and belief, that law-enforcement database information about the dismissed matter may have been maintained, accessed, or relied on during the February 2024 parking-lot encounter.

131. The database association between Plaintiff and the registered owner came from law-enforcement, criminal-justice, CAD, RMS, LEDS, or other associated-person information rather than ordinary DMV registration ownership records.

132. The association came from a prior dismissed matter, did not reflect Plaintiff's conduct on February 4, 2024, and did not identify Plaintiff as engaged in criminal activity.

133. Farlow's use of vehicle and associated-person information occurred during an encounter that began without observed criminal conduct, a traffic violation, a public-safety threat, or individualized suspicion tied to Plaintiff.

134. Beaverton's own public STOP dashboard reported racial disparities in police-initiated stop activity. For the October 1, 2023 through September 30, 2024 reporting period, the dashboard reported that Black individuals accounted for 7.76% of daytime Beaverton stops and 10.44% of nighttime Beaverton stops, while listing the Black census benchmark at 2.60%.

135. The same dashboard reported a higher arrest share for Black individuals in the surrounding stop data. Combining the daytime and nighttime tables, Black individuals accounted for 97 of 766 arrests, or approximately 12.66%, in the reported Beaverton stop data.

136. The City acknowledged limits in comparing stop data to residential census data. Beaverton's 2024 Bias-Based Policing Report stated that residential census data may not perfectly measure the demographics of the motoring public and that Beaverton's daytime population differs from its residential population.

137. The same report stated that Beaverton's bias-based-policing reporting is reviewed by the Chief of Police to identify training or operational changes that should be made to improve service.

138. Plaintiff does not allege that the STOP data alone proves intentional discrimination. Plaintiff alleges that the City's policies, data collection, public reports, and reported disparities gave the City notice of the need to train, supervise, review, and correct officer-initiated encounters for race-neutral justification.

139. Farlow then identified the basis for the arrest as a warrant for firing a weapon in public.

140. That statement did not match the administrative supervision arrest authority later identified in records.

141. The authority used to arrest Plaintiff was an administrative supervision arrest order, not a judicial warrant for firing a weapon in public.

142. Plaintiff had no pending charge or court-issued warrant for firing a weapon in public at the time of the arrest.

143. Officer Cochrane participated in the later physical arrest, restraint, custody transfer, or transport of Plaintiff after the parking-lot encounter escalated.

144. Farlow did not tell Plaintiff at the scene that the arrest authority was an administrative supervision arrest order.

**F. Plaintiff was held in custody, the disputed predicates were not corrected, and DCJ records continued to carry consequences.**

145. Plaintiff was released on or about March 4, 2024, after approximately thirty days in custody following the February 4, 2024 parking-lot arrest. That custody period was longer than the fifteen days Oregon law allows for a post-prison supervision violation unless an exception applies.

146. Plaintiff was not told, before or during that custody period, that any exception applied, that a qualifying local sanction had been imposed, or that the Board or a designated representative had started a sanction hearing. When Plaintiff raised the fifteen-day custody limit during the hearing process, Hearing Officer Jennifer Reiser did not identify any exception and

stated in substance that Plaintiff would need to seek relief outside the corrections hearing process.

147.    Plaintiff objected that the disputed supervision conditions and treatment demands were not valid grounds for a violation.

148.    The hearing recordings are expected to confirm the discussion about the fifteen-day limit, the lack of an identified exception, and Reiser's response.

149.    The hearing and record process treated the disputed condition framework as enforceable and did not correct Moore's use of contested treatment demands as violation grounds or Stevens's approval or maintenance of the challenged arrest and custody process.

150.    After Plaintiff was released, DCJ granted written permission for contact that had previously been withheld.

151.    Based on the records available to Plaintiff, Stevens designated or maintained inoperative time on Plaintiff's supervision record without advance notice, a separate hearing, or a court order.

152.    The inoperative-time designation and related records extended or impaired Plaintiff's supervision status and created continuing record consequences.

153.    Defendants' records continue to reflect disputed supervision violations, arrest grounds, custody grounds, or inoperative-time entries that Plaintiff contends were unauthorized, unsupported, or imposed without adequate process.

**G. Plaintiff suffered liberty, family, work, financial, reputation, and record harms.**

154.    Plaintiff lost liberty through the parking-lot seizure, physical arrest, restraint, transport, and custody alleged above.

FIRST AMENDED COMPLAINT - Page 20

155.    Plaintiff lost work opportunities, income, and work stability because the arrest and custody prevented him from working and meeting work-related obligations.

156.    Plaintiff suffered family harm because the challenged supervision demands, custody period, and delayed written contact permission interfered with his relationship with his child and his ability to maintain family contact.

157.    Plaintiff suffered emotional distress, humiliation, and reputational harm from the seizure, arrest, custody, and being identified or treated as subject to a weapons-related warrant.

158.    Plaintiff suffered additional financial losses connected to being arrested and in custody, including vehicle, housing, and custody-related losses.

159.    Plaintiff continues to face collateral consequences and government-record harm from challenged arrest, violation, sanction, custody, and inoperative-time records that remain available for future reliance.

## V. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## 42 U.S.C. § 1983

### Retaliation, First Amendment Violation

### Against Moore and Stevens in their individual capacities.

160.    Plaintiff incorporates paragraphs 1 through 159 as though fully set forth herein.

161.    Plaintiff engaged in protected First Amendment activity by filing a formal grievance against Moore and by continuing to object to DCJ's supervision administration, condition enforcement, family-contact restriction, treatment demands, arrest process, custody process, and record process.

FIRST AMENDED COMPLAINT - Page 21

162. The First Amendment protects a person's right to complain about government conduct and to seek redress without retaliation, including in correctional settings. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

163. Moore knew Plaintiff had filed the January 13, 2023 grievance because the grievance identified her conduct and concerned her supervision of Plaintiff.

164. Moore took adverse action by communicating nonexistent failure-to-appear warrant information during the January 21, 2023 traffic stop, initiating or maintaining the January 2024 administrative arrest process, and using challenged condition demands as violation predicates.

165. Stevens took adverse action by reviewing, approving, maintaining, or adopting Moore's administrative arrest process after being informed of Plaintiff's protected objections.

166. Those actions would chill a person of ordinary firmness from continuing to file grievances and object to supervision conduct.

167. The timing of Moore's January 2023 conduct, Moore's knowledge of an official grievance, and the absence of a valid failure-to-appear warrant support retaliatory causation.

168. The timing of the challenged actions, Moore's knowledge of Plaintiff's grievance, the use of unsupported violation predicates, and continued pressure after notice support a plausible inference of retaliatory motive. See *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995).

169. Using nonexistent warrant information, demands not shown in the governing written conditions, or unverified condition predicates after notice did not serve a legitimate supervision purpose.

170.    The adverse actions were not narrowly tailored to any legitimate supervision objective and would not have been taken in the absence of Plaintiff's protected activity.

171.    Moore and Stevens performed supervision, investigation, enforcement, and administrative arrest functions. They were not acting as neutral adjudicators when they caused or approved of the challenged arrest process.

172.    No reasonable supervision officer or supervisor with Moore's and Stevens's records and notice could believe it was lawful to use nonexistent warrant information or contested, unverified condition demands as predicates for arrest after Plaintiff repeatedly requested clarification and correction.

173.    Moore and Stevens directly and proximately caused Plaintiff's loss of liberty, work harm, family harm, emotional distress, financial loss, and continuing record harm.

## SECOND CLAIM FOR RELIEF

## 42 U.S.C. § 1983

## Unreasonable Search and Seizure, Fourth Amendment Violation

## Against Farlow, Cochrane, Moore, and Stevens in their individual capacities.

174.    Plaintiff incorporates paragraphs 1 through 159 as though fully set forth herein.

175.    Plaintiff pleads two seizure events. The first is Farlow's initial show-of-authority seizure during the parking-lot encounter. The second is the later physical arrest, restraint, custody transfer, or transport.

176.    The Fourth Amendment protects persons from unreasonable searches and unreasonable seizures.

177.    Farlow seized Plaintiff before any physical arrest by positioning his police vehicle in front of Plaintiff's parked vehicle in a manner that blocked or restricted forward movement.

178.    Farlow continued the seizure by repositioning across the parking lot while maintaining control and observation over Plaintiff's vehicle.

179.    The initial seizure lacked reasonable suspicion because no specific and articulable facts connected Plaintiff to criminal activity at the time the seizure was initiated.

180.    Farlow used vehicle-registration, DMV, law-enforcement, criminal-justice, CAD, RMS, LEDS, or associated-person information to extend or escalate the encounter.

181.    Ordinary DMV registration information did not identify Plaintiff as the registered owner, co-owner, or authorized registrant of the vehicle, and the database association between Plaintiff and the registered owner came from law-enforcement or criminal-justice information rather than ordinary DMV registration ownership records.

182.    That association came from a prior dismissed matter, did not reflect Plaintiff's conduct on February 4, 2024, and did not identify Plaintiff as engaged in criminal activity.

183.    The later arrest was not based on a judicial warrant for a weapons offense.

184.    The later arrest was based on an administrative supervision arrest process initiated by Moore and reviewed, approved, maintained, or adopted by Stevens.

185.    The administrative arrest process lacked reasonable grounds because the alleged violation predicates were unverified, contested, or based on demands not shown in the governing written conditions.

186.    The absence of verified and lawful violation predicates rendered the administrative arrest authority constitutionally deficient.

FIRST AMENDED COMPLAINT - Page 24

187.    Moore and Stevens had time and access to records, allowing them to verify the governing conditions before causing an arrest.

188.    Farlow identified the arrest basis as a warrant for firing a weapon in public.

189.    A reasonable officer would understand that a judicial warrant for a weapons offense is different from an administrative supervision arrest order.

190.    Farlow did not tell Plaintiff at the scene that the arrest authority was an administrative supervision arrest order, which prevented Plaintiff from addressing the actual administrative basis for the arrest.

191.    Cochrane participated in the later physical arrest, restraint, custody transfer, or transport although the stated weapons-warrant basis did not match the administrative arrest authority later identified in records.

192.    Moore and Stevens caused the later arrest and custodial seizure by setting in motion the administrative process that resulted in Plaintiff's arrest. See *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir. 2012) (en banc).

193.    Moore and Stevens did not merely provide background information or passive records. Moore initiated, requested, or maintained the administrative arrest process, and Stevens reviewed, approved, maintained, or adopted that process after receiving notice that the predicates were disputed, unsupported, or not shown in the governing written conditions.

194.    The administrative arrest process supplied the operative authority that Beaverton officers later executed during the February 4, 2024 parking-lot encounter.

195.    It was foreseeable that maintaining active administrative arrest authority would cause law-enforcement officers to arrest Plaintiff when they encountered him.

196.    But for Moore's initiation or maintenance of the administrative arrest process and Stevens's review, approval, maintenance, or adoption of that process, Beaverton officers would not have had the administrative supervision arrest authority used to arrest Plaintiff.

197.    Moore and Stevens were not objectively reasonable in setting arrest authority in motion without verifying the factual and legal predicates. See *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986).

198.    Clearly established law put reasonable officials on notice that a person may not be seized or arrested through unsupported, unverified, or materially misleading predicates, and that an official who causes arrest authority to issue cannot avoid liability merely because another officer later executes the arrest.

199.    Moore and Stevens are not entitled to qualified immunity because the pleaded facts show that they had notice of Plaintiff's objections, had access to the governing records, had time to verify the asserted violation predicates, and nevertheless caused or maintained the arrest authority that led to Plaintiff's seizure.

200.    Farlow was not objectively reasonable in initiating a parking-lot seizure before observing conduct that supplied reasonable suspicion.

201.    Farlow and Cochrane were not objectively reasonable in continuing or executing the later physical arrest under a weapons-warrant explanation where the arrest authority later identified in records was administrative and did not match that stated basis.

202.    Farlow and Cochrane are not entitled to qualified immunity because reasonable officers would have known that a seizure requires objective justification and that a weapons-

warrant explanation cannot justify an arrest when the actual authority was an administrative supervision order and no judicial weapons warrant existed.

203.    The individual defendants directly and proximately caused Plaintiff's loss of liberty, physical restraint, custody, work harm, family harm, emotional distress, financial loss, and continuing record harm.

### THIRD CLAIM FOR RELIEF

### 42 U.S.C. § 1983

### Procedural Due Process, Fourteenth Amendment Violation

### Against Moore and Stevens in their individual capacities.

204.    Plaintiff incorporates paragraphs 1 through 159 as though fully set forth herein.

205.    Plaintiff had a protected liberty interest in remaining free from custody while on supervision. *Morrissey*, 408 U.S. at 482.

206.    Plaintiff also had protected interests in the lawful duration and administration of his supervision term and in avoiding additional custody or supervision-record consequences based on unsupported predicates.

207.    Moore and Stevens deprived Plaintiff of those interests by using contested supervision demands as violation predicates, causing administrative arrest authority to issue, causing custody, and maintaining inoperative-time or violation records without adequate process.

208.    Plaintiff's family contact, work, reputation, and financial harms flowed from those process deprivations.

209.    Plaintiff did not receive timely and meaningful notice of the specific violation predicates before the administrative arrest process was used against him.

210. Plaintiff did not receive disclosure of the evidence that Moore and Stevens relied on before the arrest was executed.

211. Plaintiff did not receive a meaningful opportunity to show that the treatment framework, reporting demands, family-contact restrictions, transfer record, or other predicates were unauthorized or unsupported before the arrest caused custody.

212. The custody alleged above exceeded the ordinary fifteen-day limit for a post-prison supervision violation, and Moore and Stevens did not provide or identify a lawful basis for keeping Plaintiff in custody beyond that limit.

213. The later hearing process did not cure that deprivation. It did not identify any qualifying statutory exception for extended confinement, did not correct the disputed condition framework, and did not provide relief from the custody or record consequences after Plaintiff objected.

214. Based on the records available to Plaintiff, Stevens's inoperative-time designation or maintenance of inoperative-time records imposed additional supervision consequences without notice, hearing, or court authorization.

215. The unclear transfer and delegation record affected the officials claiming authority over Plaintiff, the conditions applied to him, the response to alleged violations, and the administrative arrest process used against him.

216. Due process requires that deprivation of conditional liberty be based on verified facts and lawful authority.

217. No reasonable supervision officer or supervisor could believe due process allowed contested and unverified condition demands or undocumented supervision authority to be used as

arrest, custody, or inoperative-time predicates after Plaintiff repeatedly requested the governing authority and records. Due process requires a loss of conditional liberty to rest on verified facts and meaningful procedures, and officials may not maintain custody or liberty restrictions after notice that the legal or factual basis is unsupported. See *Morrissey v. Brewer*, 408 U.S. 471, 484-89 (1972); *Haygood v. Younger*, 769 F.2d 1350, 1354-59 (9th Cir. 1985) (en banc).

218.    Moore and Stevens directly and proximately caused Plaintiff's loss of liberty, family harm, work harm, emotional distress, financial loss, and continuing record harm.

## FOURTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983

### Equal Protection, Fourteenth Amendment Violation

### Against Farlow in his individual capacity.

219.    Plaintiff incorporates paragraphs 1 through 159 as though fully set forth herein.

220.    The Equal Protection Clause prohibits intentional race-based investigative escalation and selective enforcement.

221.    Plaintiff is a Black man.

222.    Farlow identified Plaintiff by race and appearance in his narrative, including that Plaintiff was a Black male with a large black beard.

223.    The Equal Protection violation arises from Farlow's discriminatory investigative decision. After observing Plaintiff, a Black man, sitting in a parked vehicle without observed criminal conduct, a traffic violation, or a public-safety threat, Farlow treated Plaintiff as a suspect and used vehicle-registration, DMV, law-enforcement, criminal-justice, CAD, RMS, LEDS, or associated-person information to identify and investigate him.

224.    The pleaded facts support discriminatory treatment because Farlow escalated the encounter against Plaintiff in circumstances where Plaintiff's conduct did not supply a race-independent reason to conduct a database-driven exploratory investigation into Plaintiff or to treat him as connected to criminal activity.

225.    The pleaded facts support a plausible inference that race was a motivating factor, and not merely incidental, in Farlow's decision to continue the investigation beyond ordinary vehicle information and into law-enforcement or criminal-justice associated-person information. That inference is supported by Farlow's race-based identification of Plaintiff, the absence of observed criminal conduct, the lack of ordinary registration information identifying Plaintiff as the registered owner or as a suspect, and Farlow's continued database-driven escalation anyway.

226.    On information and belief, a similarly situated white person sitting in the same parked vehicle, with the engine off and without observed criminal conduct, would not have been subjected to the same exploratory law-enforcement database investigation or investigative escalation.

227.    Farlow's race-based investigative escalation caused constitutional injury because it prolonged or intensified the encounter, led Farlow to identify Plaintiff through law-enforcement or criminal-justice database associations, and carried the encounter forward into seizure, arrest, custody, reputational harm, financial harm, and continuing record consequences.

228.    The City's policies and published STOP materials provide context for that inference. They show that Beaverton officers were expected to articulate reasons for contacts independent of protected characteristics and that the City collected race-related stop data for supervisory review.

229.    Plaintiff does not rely on race, STOP data, or the database inquiry in isolation. Plaintiff pleads the full sequence, including Plaintiff's visible race, the lack of observed criminal conduct, the ordinary registration mismatch, the continued associated-person database investigation, the weapons-warrant explanation, and the resulting seizure and arrest, to support a plausible inference that race was a motivating factor in Farlow's investigative escalation and that the escalation caused Plaintiff's injuries.

## FIFTH CLAIM FOR RELIEF

## 42 U.S.C. § 1983

## Municipal Liability, Monell

## Against Multnomah County and the City of Beaverton.

230.    Plaintiff incorporates paragraphs 1 through 159 as though fully set forth herein.

231.    A municipality is liable under § 1983 when an official policy, custom, practice, final policymaker decision, ratification, or failure to train amounting to deliberate indifference causes a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91, 694 (1978); *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); *Lytle v. Carl*, 382 F.3d 978, 987-88 (9th Cir. 2004).

232.    A municipality is not liable merely because it employs a wrongdoer. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997).

233.    Multnomah County is liable because DCJ officials with supervisory, managerial, records, and local-control responsibilities received repeated notice of the challenged supervision authority and condition framework and failed to adequately address or correct it.

234. The notice reached Altman, Stevens, Scroggin, Holt, Wallis, and other DCJ personnel before, during or after the conduct that caused Plaintiff's injuries.

235. Altman directed Plaintiff to continue following Moore's supervision directions after receiving Plaintiff's formal grievance.

236. Scroggin received Plaintiff's professional standards escalation and requested additional information.

237. Stevens received written notice of the condition, family-contact, treatment, and warrant issues before, during and after the custody and record process, then maintained the warrant posture while copying Scroggin, Holt, and Moore.

238. Holt was identified as the Local Control Unit manager for grievances concerning incorrect conditions and was copied on Plaintiff's January 2024 written notice.

239. Wallis received records requests seeking the basis for Moore's treatment authority, transfer records, violation reports, arrest orders, detention records, measurable contacts, and sanctions.

240. The County's records or litigation admissions show that Stevens reviewed or approved the administrative arrest order before it was transmitted to law enforcement.

241. Multnomah County maintained or ratified a practice of administering supervision without ensuring that transfer authority, condition authority, and violation authority were documented before officers enforced conditions or sought arrest consequences.

242. Multnomah County maintained or ratified a practice of allowing supervision officers and supervisors to treat contested case-management demands as enforceable violation predicates without timely verifying the written authority for those demands.

243.    Multnomah County maintained or ratified a practice of allowing administrative arrest authority to proceed without adequate investigation into whether the underlying terms had been violated.

244.    Multnomah County maintained or ratified a practice of preserving violation, custody, sanction, or inoperative-time records after Plaintiff objected that the predicates were unauthorized or unsupported.

245.    Multnomah County failed to train and supervise DCJ officers on supervision transfer authority, written conditions, special-condition authority, administrative arrest investigations, post-prison confinement limits, records correction, and retaliation safeguards.

246.    The need for training was obvious because DCJ officers supervise liberty-restricted persons, request arrest authority, affect family contact, create violation records, and trigger custody consequences.

247.    Multnomah County's customs, ratification, failure to train, failure to supervise, and deliberate indifference were moving forces behind Plaintiff's First Amendment, Fourth Amendment, and Fourteenth Amendment injuries. These policies and failures were the moving force behind the constitutional violations because they permitted and caused the specific conduct alleged above.

248.    The City of Beaverton is liable because its officer initiated and prolonged a parking-lot seizure without reasonable suspicion and then continued the arrest process while identifying the authority to Plaintiff as a warrant for firing a weapon in public.

249. The City maintained a policy, custom, practice, or training failure that allowed officers to convert or prolong parking-lot encounters into seizures without objective reasonable suspicion.

250. The City maintained a policy, custom, practice, or training failure that allowed officers to use vehicle-registration, DMV, or associated-person information to escalate encounters without individualized suspicion tied to the person being detained.

251. The City maintained a policy, custom, practice, or training failure that allowed officers to execute administrative supervision orders without accurately identifying the legal category, source, and factual basis of the order.

252. The City failed to train officers on the difference between judicial warrants, administrative supervision arrest orders, criminal charges, and database or dispatch information.

253. The City failed to train, supervise, or correct officers concerning race-neutral investigative decision-making and the prohibition against race-based investigative escalation.

254. Beaverton's own policy required justification for officer-initiated contacts independent of protected characteristics. The City's published Policy 401 required officers to be prepared to articulate sufficient reasons for contacts independent of protected characteristics.

255. Beaverton's published STOP data and bias-based-policing reports placed the City on notice that training and supervisory review were necessary. The reported disparity between Black stop and arrest percentages and the Black census benchmark supported a need for meaningful review of officer-initiated encounters, race-neutral justification, and database-driven investigative escalation.

256.    Plaintiff pleads the statistics together with Farlow's parking-lot seizure, registration and associated-person inquiry, race-based description, and weapons-warrant explanation to show notice, deliberate indifference, and moving-force causation.

257.    The need for training was obvious because municipal police officers routinely use vehicle and database information, initiate encounters in public places, distinguish consensual encounters from seizures, and execute arrest authority supplied through CAD or dispatch systems.

258.    The City's failures and related customs were moving forces behind Plaintiff's unreasonable seizure, equal-protection injury, reputational harm, work harm, and continuing record harm.

**SIXTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202**

**Declaratory and Equitable Relief, Continuing Records and Official-Capacity Conduct Against all Defendants in their official capacities and against the municipal Defendants.**

259.    Plaintiff incorporates paragraphs 1 through 159 as though fully set forth herein.

260.    An actual controversy exists because Defendants' records continue to reflect challenged arrest, violation, custody, sanction, or inoperative-time predicates that Defendants may maintain, use, share, or rely on in future government processes.

261.    Those records continue to expose Plaintiff to collateral consequences, reputational harm, government-record harm, and future reliance by law enforcement or supervision agencies.

262.    Plaintiff seeks a declaration that Moore and Stevens violated the First Amendment by using supervision authority and arrest processes in response to Plaintiff's protected grievances and objections.

263.    Plaintiff seeks a declaration that Defendants violated the Fourth Amendment by initiating, prolonging, causing, or executing an unreasonable seizure without adequate factual or legal grounds.

264.    Plaintiff seeks a declaration that Moore and Stevens violated the Fourteenth Amendment by using contested and unverified condition demands as arrest, custody, violation, or inoperative-time predicates without adequate process.

265.    Plaintiff seeks a declaration that Farlow violated the Fourteenth Amendment by escalating an investigation and seizure because of race.

266.    Plaintiff seeks a declaration that Multnomah County and the City of Beaverton are responsible for the municipal practices, failures, customs, ratification, or training deficiencies that caused the constitutional injuries pleaded above.

267.    Plaintiff seeks an order requiring correction, removal, segregation, annotation, or non-use of records that identify unauthorized or unsupported condition demands as valid violation, arrest, custody, sanction, or inoperative-time predicates.

268.    Plaintiff seeks any further equitable relief necessary to prevent Defendants from relying on the challenged records against Plaintiff in future government processes.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff BARRY WASHINGTON respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

269.    Compensatory damages against all liable Defendants in an amount to be determined at trial.

270.    Punitive damages against Moore, Stevens, Farlow, and Cochrane in their individual capacities upon proof that their conduct was malicious, oppressive, reckless, or callously indifferent to Plaintiff's federally protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

271.    Declaratory relief as set forth above.

272.    Equitable relief requiring correction, removal, segregation, annotation, or non-use of challenged supervision, arrest, custody, sanction, violation, and inoperative-time records.

273.    Costs and attorney fees under 42 U.S.C. § 1988 to the extent permitted by law.

274.    Such other relief as the Court deems just and proper.


### JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable under Federal Rule of Civil Procedure 38(b).


Respectfully submitted,

DATED: June 24, 2026

*/s/ Barry Washington*

BARRY WASHINGTON
Plaintiff, Self-Represented Party


FIRST AMENDED COMPLAINT - Page 37

**CERTIFICATE OF SERVICE**

I certify that on June 24 2026, I filed the foregoing First Amended Complaint with the Clerk of the United States District Court for the District of Oregon through the Court's CM/ECF system, which will send notice to all registered counsel of record.

*/s/ Barry Washington*

BARRY WASHINGTON
Plaintiff, Self-Represented